3 | 167
49 | 918

## MORTON et al. *v.* PACKWOOD et al.

Where the matters at issue in an opposition by the heirs of the wife to an account presented by the surviving husband as executor, are the right of the heirs to a certain interest in a plantation and slaves alleged to be community property, and the simulation of a sale of the property made by the husband before the dissolution of the community, the judgment rendered thereon may be pleaded as *res judicata* to an action by the heirs against the husband personally for a partition of the same property alleged to be owned by themselves and the defendant, and for a judgment recognizing their rights to an undivided portion of it and declaring the simulation of the sale made by the husband. The fact that the proceedings on the opposition were against the defendant as executor, and that the opposition was to his account as such, will not prevent the judgment from being set up as *res judicata*, on the ground that the demands in the two cases were not made by the parties in the same quality. *Per Curiam:* The law giving a preference in the administration of successions to those who are interested in them, it generally happens that the administrator, either as heir or creditor, has an interest adverse to that which he represents. His individual interest is litigated in the account which he presents, and on which his claim, as heir or creditor, is exhibited; in the eye of the law he is personally a party, though his personal rights have been asserted in his representative capacity; and if one having an adverse interest make an issue on the claim, any judgment rendered on it will be binding on both parties.

APPEAL from the Fifth District Court of New Orleans, *Buchanan*, J. The facts of this case are stated at length in the opinion of the court *infrá*.

*Roselius, Prentiss* and *Finney*, for the appellants. The exception must be determined by art. 2265 of the Civil Code. The quality of one of the parties is not the same in these two suits. In the first *Packwood* appears neither in the pleadings nor in the judgment in his personal quality, but always in his representative quality, as testamentary executor of the will of *Alice Packwood*, deceased. The original petition filed by two of the present plaintiffs, simply calls upon him in his representative capacity, to render an account of his administration. He responds in the same quality, and avers his readiness to account. He then, still acting only in his representative quality, presents his account, prays that it be homologated, and that he be discharged from further responsibility " as executor." To this the original plaintiffs object, and oppose the homologation on the ground, principally, that there was property belonging to the succession of *Alice Packwood*, not embraced in the account, for which the executor was responsible, and they pray that "the executor" (not *Samuel Packwood* in his individual quality,) be ordered to account therefor. The judgment of the court below was in accordance with the pleadings. It decreed nothing against *Samuel Packwood* personally, but only that, as executor, he should amend the account of his administration. From this judgment *Samuel Packwood* appealed. The case will be found reported in 12 Rob. 234, and the judgment of the court is in these words : " It is therefore ordered and decreed that the judgment of the Court of Probates be reversed ; and it is further ordered that the opposition, so far as relates to the Union Bank stock be maintained, and that in all other respects it be overruled and rejected ; and that the account rendered by the executor, being thus amended, be approved and homologated ; that the opponent pay the costs of appeal," &c.

The error of the court below arises out of the accidental fact, that the executor of the will of *Alice Packwood*, and the joint owner of one undivided half of the plantation and slaves in controversy, happen to be one and the same person. But though the same party or person naturally, they are wholly distinct in their legal quality. *Samuel Packwood*, executor, &c., has no more relation to *Samuel Packwood* personally, than Paul has to Caius. Suppose the executor had not been the joint owner of the property in controversy, and this

MORTON
v.
PACKWOOD,

action for a partition had been instituted against a third person, could the decision in the case of *Packwood's* succession have been pleaded as "*res judicata?*" Clearly not. Such an exception would have been overruled at once. But where is the difference? *Samuel Packwood*, and *Samuel Packwood*, executor, are two different legal persons, as much as two natural ones. A representative stands in the place of that which he represents, not for himself. *Packwood* represented the succession of his wife *Alice*. The question in the suit with him was, the extent of his accountability as such representative, not his personal accountability as claimant of property in his own right. The question of his personal right to the property in controversy arose collaterally, in discussing his duty and liability as executor. He was in that matter a third person, and in no wise affected by the decision. He was personally no more bound by it than *Stewart*, who it is not pretended was a party. The exception of "*res judicata*" is "*stricti juris*," and will not be allowed unless it is imperative. See 10 Toullier, nos. 143, 157, 213. 13 Duranton, no. 502. *Cloutier* v. *Lecompte*, 3 Martin, 481. *Mercier* v. *Sterling*, 5 La. 472. *West* v. *His Creditors*, 1 An. R. p. 365. "The thing demanded" is not the same. The thing demanded here is the partition of certain property alleged to be owned jointly by plaintiffs and defendant. The thing demanded in the former suit was an account from the executor ; the thing adjudged, was the accountability of the executor, and nothing more. The judgment homologating his account, settled the extent of his liability in that capacity, and nothing further. The title of the heirs to the property of their ancestor is not derived from the executor, and cannot be affected by a decree homologating his account. Suppose the account rendered had been homologated without opposition; would that have precluded the heirs from suing for property not embraced in the account? It is true the question of title to the property in controversy arose on the trial of the opposition, but it was not the real point in controversy. The real point was, the accountability of the executor. Now an executor may be accountable for goods which do not belong to the succession, for instance, where they are are found among the goods of the succession, and not claimed by the true owners. So on the other hand he may not be accountable for goods that do belong to the succession, as when they have not come into his possession, and are beyond his control. A judgment therefore that the executor is not bound to account to the heirs for certain property claimed by them, is not a judgment that they have no title to it as heirs, but only that the executor is not responsible for it. Their actual title is not the thing adjudged.

*W. D. Hennen*, for the defendants. I. The thing demanded was the same. The opposition was a suit, in which the opponents were plaintiffs, and the executor, defendant; and if the judgment of homologation, rejecting the opposition, possess the requisite identities with the present action, it will have the force of *res judicata* ; for it matters not in what form of action or proceeding, whether by petition or exception, or intervention, the question may have been presented, if the same question, once judicially decided between the parties, be again agitated, it is sufficient to create the presumption resulting from the thing adjudged, and forms a complete bar. *Plique* v. *Perret*, 19 La. 328. The exception of *res judicata* estops, whenever the same question recurs between the same parties even under a different form of procedure. Exceptio rei judicatæ obstat, quoties inter easdem personas eadem quæstio revocatur vel alio genere judicii. L. 7, § 4, ff. De Except. rei. judic. 44, 2. And see *Succession of Durnford*, 1 An. R. 93.

From a comparison of the petition in this case with the opposition to the executor's account, it is clear that in each the thing demanded is the same, to wit: that the undivided half of the plantation and slaves should be recognized as belonging to the community. It was pretended in the lower court, that the thing demanded is different, because in the one case the thing demanded was, that the executor should account, while here, the thing demanded is that a partition be made of the property. The plaintiffs ask now for their portion of an estate of which they pray the partition ; they asked then that the whole of that estate should be recognized as belonging to a succession of which they were heirs; the right which they claim now is embraced in the right they claimed then ; and the right claimed in the first suit having been passed upon must conclude the right claimed in the second. "C'est même un principe général que toutes les fois qu'on demande par une seconde action quelque partie d'un tout qu'on avait demandé par une première, la chose demandée est

censée la même, soit qu'il s'agisse d'un corps certain, d'une quantité, ou d'un droit incorporel. Par exemple, j'ai echoué dans la demande de la propriété d'un fonds ; j'en demande l'usufuit par une seconde action, fondée sur la même cause. Je suis repoussé par l'exception de la chose jugée. Ma seconde demande était renfermée dans la première; car l'usufruit est une partie du fonds." Toullier, t. 10, p. 201, nos. 146, 147. In like manner, Duranton, after giving several illustrations from the roman law, says: " Dans tous ces cas, la chose demandée actuellement etant comprise dans la première demande, elle a par cela même été jugée, et il est né du jugement l'exception rei judicatæ," t. 13, p. 489. no. 463.

It is true that in the opposition nothing was said of the things attached to the plantation, the horses, cattle, &c. ; and that the opponents only demanded the revenues from 1840 to 1846. But this is not such a difference as destroys the identity of the thing demanded. For these things were either attached to the plantation and so formed a part of it, or they are but the fruits which have since been produced by the thing itself. "Si la première demande n'est que d'un seul corps, tout ce qui en faisait partie au moment de la demande, quand même il en serait séparé lors de la seconde, tout ce qui en est provenu, comme les fruits, les arbres coupés, le croît des animaux, les enfans mis au monde par une esclave, tous les accessoires, tout ce qui en dépend par accession, alluvion ou autrement, est censé avoir été compris dans la première demande." 10 Toullier, p. 203, no. 151. If the thing producing has been decided not to be the property of the claimant, it is clear the thing produced cannot be ; for it is the owner's. The ownership of the plantation and slaves having been settled in the opposition, it ought not to be again brought in question : for this ownership, it appears to us, is the thing demanded within the meaning of the law. Et quidem ita definiri potest, toties eandem rem agi, quoties apud judicem posteriorem id quæsitur, quod apud priorem quaesitum est. L. 7, § 1. ff. De except. Rei Judic. 44, 2.

II. The cause of action is the same. " Que faut-il donc entendre par la cause de la demande, causa petendi? car le mot est un peu vague. Il importe beaucoup d'en determiner le sens précis. C'est, dit Neratius, la cause prochaine de l'action, causa proxima actionis, et non pas l'espèce ou le genre d'action qu'un plaideur choisit pour demander en justice la chose qu'il réclame; car deux actions différentes peuvent avoir la même cause; la même cause peut produire plusieurs actions. Si la chose demandée est la même, la seconde action, quoique différente de la première, doit donc être repoussée par l'exception de la chose jugée, si elle est fondée sur la même cause." Toullier, p. 213, no. 161. Toullier illustrates this distinction by an example from the roman law, which may however arise under both our own and the french Code. The redhibitory action and the action quanti minoris are each founded on the defects or vices of the thing sold, by which its utility is either impaired or wholly destroyed, and which if the purchaser had known, he would have purchased at a less price or not at all. By the redhibitory action the purchaser demands the dissolution of the sale, the return of the price, and, in some cases, damages; while in the action quanti minoris, he demands only the return of part of the price, the sale itself still remaining valid. Yet by the roman law, after bringing the action quanti minoris, the vendee could not bring the redhibitory action. " Cette seconde action, quoique d'une autre espèce, quoique les conclusions en soient différentes, n'en doit pas moins être repoussée par l'exception de la chose jugée, car l'acheteur ne fait que changer d'action, actionem mutat. La cause de la seconde action, causa proxima actionis, est la même que celle de la première. Ce sont les vices rédhibitoires, les vices cachés de la chose vendue, que le vendeur est tojours censé avoir connus et qu'il doit garantir. La question à juger dans la seconde action est donc la même que la question jugée dans la première. La chose vendue a-t-elle des vices cachés que le vendeur doive garantir ? Cette question a déjà été jugée. Ibid, no. 163.

By the cause of action then is meant, the immediate facts or circumstances on the proof of which the party's right of recovery depends. In the former suit the cause of action was the facts which it was necessary for the opponents to prove in order to make good their opposition. These were, first, that they were the heirs of *Mrs. Packwood: second,* that the plantation and slaves belonged to the community : and *third,* that the sale from *Packwood* to *Stewart*

was simulated. And what now is the cause of action on which the plaintiffs base their present action ? They allege, *first*, that they are the heirs of *Mrs. Packwood*; *secondly*, that the plantation and slaves belong to the community; and *thirdly*, that the sale from *Packwood* to *Stewart* was simulated. The test given by the common law doctrine of estoppel, which is the same in most points as our exception of *res judicata*, shows the identity of the cause of action very clearly. "A verdict, says Starkie, for the same cause of action between the same parties is absolutely conclusive. And the cause of action is the same when the same evidence will support both actions, although the actions may happen to be founded on different writs. This is the test to know whether a final determination in a former action is a bar or not to the subsequent action, and it runs through all the cases in the books both in real and personal actions." Starkie's Evidence, part 2, sec. 64. Thus a judgment in trespass will be a bar to an action of trover for the same taking. 2 Bl. R. 831. And in the case of *King* v. *Rice*, 7 Johnson, 20, which was an action of assumpsit for certain slaves, to which a former action of trespass for the same slaves was pleaded in bar, the court said : "What is meant by the same cause of action is, where the same evidence will support both the actions, although they happen to be grounded on different writs. The plaintiff below brought an action of trespass for the taking of these slaves, and failed: and now he waives the tort and brings assumpsit upon the same proof. It was shown that the former verdict was upon the merits of the claim, and upon the ground that the plaintiff had no right to the slaves. If he had no right against the defendant for the taking of these slaves because he had no right of property, he had no right without further and different proof to the value of those slaves." And in this case, if the plaintiffs had no right of action to compel *Packwood* to account for the plantation and slaves because they did not belong to the community, they have no right without further and different proof to an action of partition of the same plantation and slaves. But it is clear that the proof on the petition in this suit cannot be different from that given on the opposition ; the cause of action therefore in each is the same.

III. There was an identity of parties. To show this, we have but to compare the opposition with the petition in the present suit.

IV. The capacity of the parties is the same. Of the capacity of the plaintiffs there can be no question ; they opposed the account in their capacity of heirs to *Mrs. Packwood;* and they sue now in the same capacity and in the same right: The only question, then, relates to the capacity of the defendant, *Packwood.* In the opposition, he was the executor of the succession, whilst, in the present suit, he appears in his private capacity, as the detainer of property, in which the plaintiffs claim an interest. It is therefore urged that his capacity in the two suits is different. It is true that, in the first suit he was executor, and that in the second he is not ; but it is also true that he appeared in the first suit, and resisted the opposition in his individual capacity, and that he appears now and resists the claim of the plaintiffs in the same capacity.

*A. Hennen*, on the same side. The only question before the court arises under the plea of *res judicata.* Art. 2265 of the Civil Code, copied *verbatim* from the Code Napoléon, must give the rule of decision. The article of the Code Napoléon is borrowed from the roman civil law. See Pand, lib. 44, tit. 2, *De Exceptione Rei Judicatæ.* Pothier's Pand. lib. 44, tit. 2. Pothier on Oblig. nos. 851, 910. 10 Toullier, nos. 143, 259. 13 Duranton, nos. 446, 528. Merlin, Rep. *verbo* Chose Jugée. Mulenbruck, Doctrina Pand., no. 153. 13 Donellus, 390, Comm. lib. 22, cap. 5. 7 Leyseri, Meditationes ad Pand. 637. Sirey, Code Annoté, ed. 1847, art. 1351.

The judgment of the court was pronounced by

Eustis, C. J. The plaintiffs sue as the heirs of the late *Alice Packwood*, wife of the defendant, who died in the city of New York, in 1840, claiming to be recognized as the owners of seven-tenths of an undivided moiety of a plantation situated in the parish of Plaquemines, with the slaves thereto belonging ; they pray for a partition of the same, and for an account of the revenues and profits received by the defendant, since the 27th of July, 1840. There was an exception of *res judicata* on the part of the defendant, which was overruled as to one of the plaintiffs, but sustained as to the rest, who have appealed. The defendant on the appeal, insists on the affirmance of the judgment.

The final decree which is pleaded in bar of the plaintiffs' suit was rendered by the Supreme Court, in Dec. 1845, on an appeal from the Court of Probates of New Orleans, in the case entitled the *Succession of Packwood, Samuel Packwood, Executor, appellant,* which is reported in 12 Rob. 335. The defendant was the testamentory executor of his deceased wife, and filed his account of executorship in the Court of Probates of New Orleans, under whose authority he acted, and prayed that the same might be homologated. Two of the heirs opposed the homologation on the ground that the executor had not accounted for the undivided half of the plantation and slaves, which is the subject of the present suit. They charge that a simulated sale had been made of it to *David Stewart,* that it was afterwards retroceded to the defendant, and that the retrocession inured to their benefit; but that if it did not, the defendant, as executor, would still be bound to account to them for the price, to wit, the sum of $100,000; they allege also other grounds of opposition to the account; they pray that the executor may be ordered to account for the revenue and crops of 1840, 1841, 1842, 1843, which exceeded $20,000 each year, and that the executor be ordered to credit the succession, and charge himself, with all the sums enumerated and set forth in the opposition, and to account for the property and assets described therein, and be condemned to pay twenty per cent damages on all sums received by him and not deposited in bank according to law.

The opposition was tried, and evidence received, *pro et con.,* in relation to the sale from the defendant to *Stewart,* and the transfer by the latter to the former of the half of the plantation and slaves, and the Court of Probates decided that the sale was simulated, and that the plantation and slaves was the common property of his deceased wife and the defendant, and that the same must be accounted for by the executor, as community property; that the proceeds of the crops of 1840, 1841, and 1842, to wit, $54,320 84, be placed to the credit of the account as assets of the community, and that of 1843 be also accounted for as community property. The decree rejected certain items charged in the account, and established certain shares of bank stock as also belonging to the community. On the appeal, the judgment of the Court of Probates was reversed, the opposition, so far as related to the bank stock, was sustained; but, in all other respects, was overruled and rejected, and the account rendered by the executor thus amended, was approved and homologated.

The authority of the thing adjudged, takes place only with respect to what was the object of the judgment. The thing demanded must be the same, the demand must be founded on the same cause of action, the demand must be between the same parties, and formed by them against each other in the same quality. Civil Code, 2265. In reference to the two suits before us, the counsel for the plaintiffs contends that two of those requisites did not concur, that the parties did not form their demands in the same quality, and that the thing demanded is not the same in both suits. In the present suit the defendant is sued personally as joint owner with the plaintiffs, and it is true that the thing demanded is a partition of the property alleged to be owned jointly, and an account of the revenues received by him since the death of his wife; but there is a question which stands before that of partition, and that is that of ownership, and the plaintiffs have expressly asked for the court to decree that the said *Samuel Packwood,* render an account of the revenues which he has received from said property since the 27th of July, 1840, and that they be recognized as entitled to seven-tenths of the undivided moiety of said plantation, slaves, &c.,

MORTON
v.
PACKWOOD.

and of the revenues proceeding therefrom. Without establishing the fact of joint ownership, it is obvious, under the allegations of the petition, that no step would be taken by a court towards effecting a partition, and the real issue of ownership cannot be considered as subordinate to the demand in partition, nor can it be so rendered by any form of action in which the claims of the plaintiffs may be presented. We consider that the basis of the present suit is the establishment of the joint ownership of the plaintiffs of their share of a moiety of the plantation and slaves and the revenues thereof, without which there could be no judgment rendered in their favor. The simulation of the sale from *Packwood* to *Stewart*, is charged as in the opposition to the executor's account, and the cause of action appears identical with the grounds taken therein, so far as relates to the plantation and slaves.

It is contended that the *thing demanded* was an account from the executor, and the *thing adjudged* was the accountability of the executor, and nothing more; and, though it is conceded that the question to the title to the property in controversy arose in the trial of the opposition, that it was not the real point in controversy. Our impression is otherwise; and whether we consider the evidence adduced, the arguments of the learned counsel engaged in the cause, or the opinions of the court of the first instance or of the last resort, the rights of the plaintiffs as affected by the sale to *Stewart* were fully examined and adjudicated upon, and the form of the final decree was the consequence of the form in which the plaintiffs thought proper to present their claims. It negatived the obligation of the executor to account far the one-half of the plantation and slaves and their revenues, as well as for the price, and repelled the allegations concerning the character of the sale to *Stewart*, of which it recognized the validity.

It is correctly stated that the proceedings in the Court of Probates in the former suit were against Samuel *Packwood*, the defendant, as executor of the last will of his deceased wife, that his account was filed as executor, and that the opposition was framed to it as the account of the executor, and that with reference to it, as such, the decree of the Supreme Court was rendered. It is contended that this defeats one of the requisites necessary to establish *res judicata* viz: that the demand between the parties must be in the same quality. This objection it will be necessary to consider in reference to the mode of proceeding in the settlement of successions, which had its origin in the spanish law, and which is still continued under the provisions of our Codes.

The law giving a preference in the administration of successions to those who have an interest in them, it generally happens that the administrator, be he an heir or a creditor, has an interest adverse to those which he represents. His individual interest is litigated in the account or tableau which he presents in which his claim as heir or as creditor is exhibited; and, if a party having an adverse interest make an issue on the claim thus exhibited, and that issue be tried, we have never heard it questioned that both parties were bound by the judgment rendered. Most successions have been settled in this mode, and there is generally no other written evidence of their adjustment than the account rendered by the administrator or executor, which becomes a judgment by being homologated after due proceedings had. On oppositions to the account rendered, matters which are necessary to the liquidation of the successions—the debts of heirs to the successions, the amounts to be collated as well those of the administrator as of other parties, are generally litigated and closed by

final judgment.   In such cases it is obvious that the person representing the succession is personally a party in relation to his individual claim, which he presents for judgment.   Every party in interest is a party plaintiff and defendant—a plaintiff for what he claims, and a defendant for what he opposes.   The mass, or succession, in the contest is passive and represented in law, but the real parties are the litigants.   In this case, on the opposition, the present plaintiffs were the actors, and represented their interest in the succession of the deceased, and, so far as related to what they demanded from the defendant, were the plaintiffs calling upon him to restore to the succession what belonged to it; it was the suit of the succession against him, and he was the defendant. On the contrary, in his claim for commissions paid for the collection of rents, which was an item of the account, he was the plaintiff and the heirs made themselves defendants to it, and represented the succession.   The defendant was in court as executor, and maintained his individual interests as presented and adjudged of record in his personal quality.   The course pursued by the counsel who were charged with the important trust of settling the respective rights of their clients, is that which has been adopted, we may say almost universally, and has been settled long since by our jurisprudence.   We do not consider that it is at all material that the appearance and acts of the defendant were in his capacity of executor.   His personal rights were asserted and determined upon. Had he been adjudged to account for the plantiffs' interest in the plantation and slaves, to restore it to the community, with its revenues, the judgment would have bound him, and could have been enforced against him.   Being once a party to the record, it would have been a vain form to have required him to appear *personally* against himself.   Rather than to require such a thing the law authorizes him to assert at will his personal rights in his representative capacity. We apprehend that such is the usage observed in the settlement of successions, under the direction of courts of Chancery.   When an executor is called upon to account, and he is a creditor, or an heir, or has claims on property in his charge, and asserts those claims, and, on adjudication, they are maintained after litigation in relation to them by competent parties, we are not aware that the judgment rendered can afterwards be drawn in question on the ground of the representative capacity in which the party asserted his rights.   On this point we have not been furnished with any authority from that system of jurisprudence, with which one of the learned counsel who argued this cause is so familiar.

Nor is the fact to be overlooked that the learned counsel who have been engaged at different times in the litigation of this succession, which has called forth so much learning, research, and ability, have themselves adopted of their own choice this mode of fixing responsibility on the defendant; and, in accordance with the uniform practice which we have stated, the same parties, on a mere statement of debts for which an application was made by the executor to sell property, litigated in the Court of Probates, and on the appeal, the right of the community to the sum of $14,747—the judgment was against the plantiff, that the executor should sell unless the heirs should make provision for the debts.   The finality of this judgment the plaintiffs' have not impugned ; on the contrary, an acquiesence in it may be inferred from the consent decree which was rendered on a rehearing.   *Succession of Packwood,* 9 Rob. 446.   We had occasion to examine the practice on this subject in one of the first cases that came before us, and our views were then in accordance with those which a

further consideration has satisfied us to be correct. *Succession of Dumford*, 1 Annual Rep. 92.

No question having been made as to the jurisdiction of the court, we think there is no difference in principle between a litigation in this form and a judgment for a sum of money, and the title to, or interest, in real property, where the parties select this mode of determining it.

We think the *causa petendi*—the ownership of the plantation and slaves, and the consequent claim to its fruits and revenues, were the real point of controversy in the original litigation, and that *Samuel Packwood* was personally a party to it in the eye of the law, although in the court of the first instance his personal rights were asserted in his representative capacity.

As the cause before us has been argued with great care, and as every thing which affects the authority of *res judicata* is of the greatest moment, we have thus given our views in relation to the several points as they have been presented in argument. But there is one fact which removes the apparent difficulty as to *Packwood's* being a party in a representative capacity only, in the original suit, and that is, that the appeal was made and taken by him in his personal capacity, in the name of *Samuel Packwood*. The appeal bond is in his name, and given personally with his sureties, in the sum of $150,000, conditioned that *Samuel Packwood* shall prosecute his appeal and shall satisfy whatever judgment shall be rendered against him, &c.

In relation to the authority of *res judicata* under our jurisprudence there can hardly be any material difference of opinion. It is in the application of the rules that controversies arise, and it must never be lost sight of that, whatever may be the hardship of any particular case, the principle itself must be maintained in its integrity as one of the great conservative elements upon which society reposes for its security and welfare.

*Judgment affirmed.*